IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | |
|---|---|
| SHEONA THOMAS, | ) Case No. 1:20-cv-1659 |
| | ) |
| Plaintiff, | ) JUDGE PATRICIA A. GAUGHAN |
| | ) |
| v. | ) MAGISTRATE JUDGE |
| | ) THOMAS M. PARKER |
| COMMISSIONER OF | ) |
| SOCIAL SECURITY, | ) |
| | ) **REPORT AND** |
| Defendant. | ) **RECOMMENDATION**[1] |

     Plaintiff, Sheona Thomas, seeks judicial review of the final decision of the Commissioner of Social Security, denying her applications for disability insurance benefits ("DIB") and supplemental security income ("SSI") under Titles II and XVI of the Social Security Act. Thomas suffers from diabetic neuropathy. She challenges the Administrative Law Judge's ("ALJ") negative findings, contending that her allegations of pain were misevaluated. Because the ALJ's decision failed to apply proper legal standards by not adequately explaining why she discounted Thomas's subjective symptom complaints, I recommend that the Commissioner's final decision denying Thomas's applications for DIB and SSI be vacated and that Thomas's case be remanded for further consideration.

---

[1] This matter is before me pursuant to 42 U.S.C. §§ 405(g), 1383(c)(3), and Local Rule 72.2(b).

I.  **Procedural History**

Thomas applied for DIB and SSI on May 25, 2017. (Tr. 319, 328).[2] Thomas alleged that she became disabled on June 1, 2013 due to diabetes, a retinal disorder, peripheral neuropathy, and a depressive disorder. *See* (Tr. 320, 328, 330, 357). She later amended her disability onset date to October 1, 2015. (Tr. 354). The Social Security Administration ("SSA") denied Thomas's applications initially and upon reconsideration. (Tr. 127-144, 165-183). Thomas then requested an administrative hearing. (Tr. 227-228).

ALJ Pamela Loesel heard Thomas's case on August 13, 2019 and denied the claim in a September 13, 2019 decision. (Tr. 20-31, 49). In doing so, the ALJ determined that Thomas had the residual functional capacity ("RFC") to perform light work, except that:

> [Thomas] is able to occasionally lift/carry 20 pounds; frequently lift/carry 10 pounds; stand and walk 2 hours in an 8-hour workday; sit for 6 hours in an 8-hour workday; occasionally push and pull in the lower extremities; avoid all exposure to hazards such as unprotected heights, moving machinery, and commercial driving; cannot perform jobs that require extensive reading or focusing on distant objects; avoid concentrated exposure to heat, wetness, and humidity; occasionally climb ramps or stairs; never climb ladders, ropes, or scaffolds; occasionally balance, stoop, kneel, crouch, and crawl; can prepare simple, routine tasks in a setting with no fast pace, no unusual production demands, and no more than infrequent changes; and interaction with supervisors, coworkers, and the public is limited to speaking and signaling.

(Tr. 25). Based on vocational expert testimony that a hypothetical individual of Thomas's age, experience, and RFC could work in available occupations as hand packager inspector, plastic hospital products assembler, and electrical accessories assembler, the ALJ determined that Thomas wasn't disabled. (Tr. 30-31). On June 22, 2020, the Appeals Council denied further review, rendering the ALJ's decision the final decision of the Commissioner. (Tr. 1-3). And on

---

[2] The administrative transcript appears in ECF Doc. 11.

July 28, 2020, Thomas filed a complaint to seek judicial review of the Commissioner's decision. ECF Doc. 1.

## II. Evidence

### A. Personal, Educational, and Vocational Evidence

Thomas was born on February 3, 1985 and was 30 years old on the claimed onset date. (Tr. 29). Thomas completed 9th grade in 1999 and had no specialized or vocational training. (Tr. 358). She had prior work experience as a concession stand employee, store associate, and hairdresser but the ALJ determined that she could not perform any past relevant work. (Tr. 29, 67-68, 87, 370).

### B. Relevant Medical Evidence

Thomas focuses her challenge upon the ALJ's Step Four consideration of the evidence and subjective symptom complaints of pain arising from her physical impairments; thus, I will summarize only the medical and opinion evidence related to her physical impairments and associated pain. *See generally* ECF Doc. 15.

On January 8, 2016, Thomas went to a medical clinic for treatment of her diabetes and complaints of fatigue. (Tr. 508). She was referred to an endocrinologist, an ophthalmologist, and a podiatrist, and received a prescription for pain medication. (Tr. 510).

On September 28, 2016, Thomas was admitted to the emergency room, presenting with a wound on a toe of her right foot. (Tr. 458). She reported having a history of insulin-dependent, type two diabetes mellitus and having a black scab on her toe for several months. (*Id.*). She reported often wearing poor fitting shoes and walking around her home barefoot, and stated that she did not monitor her blood sugar because she did not have a working glucometer. (*Id.*). She denied any back pain, extremity weakness or swelling, or calf tenderness. (*Id.*). On

examination, Thomas had a dry, cracked callus on the toe but normal gait.  (Tr. 459).  Thomas was diagnosed with hyperglycemia and a foot callus.  (Tr. 462).  An x-ray of Thomas's right foot taken the same day indicated that she had a break in the skin on her toe with gas and mild swelling, but nothing suggested osteomyelitis.  (Tr. 467).

On October 28, 2016, Thomas first saw Michael Le, DO, as her primary care provider.  (Tr. 499).  She presented with foot pain, which began when she purchased new shoes the month before.  (Tr. 499-500).  She reported that the pain had progressed and was localized to the fifth toe of her right foot and the soles of her feet, causing her numbness and tingling sensations and difficulty walking.  (Tr. 500-501).  The pain also increased when walking.  (Tr. 500).  She further reported blurry vision and ulcerations, scaling, and pigmentation on her skin.  (Tr. 501).  She also reported a history of type two diabetes with ophthalmic and neurologic complications and hypertension.  (Tr. 500).

Dr. Le examined Thomas's foot, noting that the toe was discolored, had an ulceration from which pus was extracted, and had decreased sensation.  (Tr. 501).  He diagnosed her with a diabetic foot infection and instructed her to immediately go to the hospital because delay in receiving medication could result in the amputation of her toe or foot.  (*Id.*).  At a follow-up visit in December 2016, Thomas reported that the infection had resolved.  (Tr. 496-497).  Dr. Le's physical examination identified two calluses on Thomas's right foot and that her diabetes was "poorly controlled."  (Tr. 497-498).  Dr. Le also referred Thomas to an endocrinologist and a podiatrist.  (Tr. 498).

Several months later, on March 7, 2017, Thomas saw podiatrist Anthony Matalavage, DPM, complaining that her diabetes caused burning pain in her toes and feet, a lesion on her right foot, and an ulcer on the fifth toe of that foot.  (Tr. 492).  A physical examination showed

that her toes had decreased sensation but remained sensitive to light touch and her foot retained its protective sensation. (Tr. 494). Additionally, Dr. Matalavage assessed Thomas to have dry skin, no open lesions, and a pre-ulcerated callus on her right foot only. (*Id.*). He diagnosed Thomas with dry skin, and uncontrolled type two diabetes with diabetic polyneuropathy, and pre-ulcerative calluses. (Tr. 495).

On May 9, 2017, Thomas had a follow-up appointment with Dr. Matalavage, during which she reported further numbness and pain in her feet that worsened with activity. (Tr. 486). Dr. Matalavage's examination found the same dryness, pre-ulcerative calluses, and limited sensation in her toes as from her initial appointment. (Tr. 488). He prescribed diabetic shoes and orthotics. (*Id.*).

A few weeks later, Thomas returned to Dr. Le and reported that she had yet to see an endocrinologist and her blood sugars had been high. (Tr. 484). His physical examination showed decreased sensation in Thomas's right foot compared to her left and a callus on the plantar surface of her right foot, as well as a well-healed ulceration on the fifth toe. (Tr. 485). Dr. Le instructed her on diabetic diet options and to see an endocrinologist. (*Id.*).

On June 6, 2017, Thomas again met with Dr. Matalavage. (Tr. 479). She stated that she had yet to get the prescription shoes and had been back on medication due to her blood sugar being "out of control." (*Id.*). The results of Dr. Matalavage's physical examination and his diagnoses was the same as the last assessment. (Tr. 481).

On June 16, 2017, Thomas saw endocrinologist Tariq Khan, MD, who noted that she had decreased sensation in both feet and was not properly checking her blood sugar. (Tr. 804, 806). He noted that Thomas appeared obese and had a callus on the sole of her right foot. (Tr. 806). He diagnosed Thomas with poorly controlled type two diabetes and obesity. (Tr. 807).

5

On July 18, 2017, Thomas followed-up with Dr. Matalavage and reported that the prescription shoes provided "some relief," but she required more pain medication. (Tr. 834). Her physical examination results and diagnoses were unchanged; and Dr. Matalavage instructed her to purchase padding to prevent ulcerations on her right foot and to contact Dr. Le for pain medication. (Tr. 836-37). On August 22, 2017, Thomas returned to Dr. Matalavage for a follow-up appointment and did not indicate any change in her complaints. (Tr. 830-31). Likewise, her physical examination and diagnoses remained the same. (Tr. 832-33).

On September 26, 2017, Thomas had a follow-up appointment with Dr. Le to discuss her issues with obtaining insulin and remembering to take it. (Tr. 828). Her physical examination was unremarkable, and she was referred to ophthalmology. (Tr. 829).

On November 21, 2017, Thomas saw Dr. Matalavage, reporting that her pain had been getting worse and acknowledging that she missed her October appointment. (Tr. 862). Her physical examination and Dr. Matalavage's diagnoses remained unchanged, but he instructed her to continue using padding to prevent ulcerations on her foot. (Tr. 864-65).

Records from University Hospitals indicated that Thomas was hospitalized from January 29, 2018 to February 1, 2018. (Tr. 1160). She initially presented with unknown drainage from her right foot and was admitted over a concern of osteomyelitis. (Tr. 1160, 1179). During her stay, an x-ray of her foot was taken that did not show any acute fracture or dislocation. (Tr. 899). A subsequent MRI did not indicate any osteomyelitis or significant joint effusion or show evidence of any fracture or dislocation. (Tr. 897-898). The MRI indicated that she had a plantar ulcer with an adjacent edema and cellulitis and that dermal fluid was collecting near the ulcer. (*Id.*). On January 31, 2019, she was again examined and was reported as having decreased strength in her right leg, an ulcer on her right foot with a draining wound, and

6

decreased sensation to fine touch and pin pricks, which was worse in her right foot compared to her left. (Tr. 1166). The following day she was discharged, following diagnosis of type two diabetes with a foot ulcer. (Tr. 1160).

On April 18, 2018, it appears that Thomas changed endocrinologists and saw Thomas Murphy, MD. (Tr. 943-944). She reported feeling fatigued but denied blurred vision and, when asked whether she exercised regularly, replied that she walked "a lot." (Tr. 944). She stated that she had burning in her feet that was not being helped by medication. (*Id.*). Dr. Murphy's impression was that she had poorly controlled diabetes and goiter. (Tr. 945).

On September 20, 2018, Thomas was admitted to the emergency room for blisters on her left foot that were draining clear fluid. (Tr. 1037). She reported that she did not "keep close track of her diabetes" and had not tested her blood sugar for a week. (*Id.*). An assessment of her musculoskeletal system indicated a normal range of motion. (Tr. 1039). During that visit, an x-ray was taken of her left foot, which showed that her left big toe had been fractured, but the fracture did not affect the joint spaces or cause any soft tissue abnormalities. (Tr. 1047, 1051). She was treated at the emergency room again in both October and November 2018 for, respectively, a diabetic foot ulcer and a superficial ulceration to the first toe on her right foot, which was tender to palpations but did not appear to require drainage. (Tr. 1010, 1014, 1065). During her last visit she reported not having taken insulin in many months because it made her "feel weird" and that she had difficulty seeing her primary care physician and endocrinologist because her insurance would not cover any more transportation costs. (Tr. 1066-1067).

On January 23, 2019, Thomas was seen at a MetroHealth medical clinic, reporting that she had previously been seen for an eye exam and was told her right eye was swollen and the left was leaking fluid and swollen. (Tr. 967-968). A physical examination showed that she had

normal sensory function but had evidence of dry skin, a healed wound on her left big toe, and a callous on her right foot. (Tr. 969).

On March 1, 2019, Thomas returned to Dr. Le complaining of neuropathy in her hands and feet. (Tr. 965-66). A physical examination showed that she appeared healthy and alert, she experienced a tingling sensation, and her extremities were normal, without any deformities, edema, or skin discoloration. (Tr. 966). She was instructed to continue to seek treatment from an endocrinologist and record her blood sugar readings. (*Id.*).

In April 2019, MetroHealth System records indicated Thomas was examined and found to have significant foot lesions but no edemas or tenderness. (Tr. 1091). She was treated again on May 20, 2019 for foot pain, specifically pain in the big toe of her left foot. (Tr. 1111). She reported numbness and tingling in her feet, and a physical examination found that she had pigmentation on her feet and no feeling for vibratory, sharp/dull, or light touch sensations on the sole of her foot. (Tr. 1111, 1114). However, she did not have any open lesions or calluses. (Tr. 1115). An x-ray taken at the same time showed healing factures on both feet. (*Id.*). The physical examination from a follow-up visit, on May 28, 2019, showed no edema on her extremities and no gross motor deficits. (Tr. 1126).

On June 25, 2019, Thomas returned to Dr. Matalavage. (Tr. 1147). She reported that her prescription shoes and orthotics were worn out and that her feet hurt all over, which increased with activity. (*Id.*). She reported that her blood sugars had slightly improved but that she had developed eye problems. (*Id.*). A physical examination found that she lacked vibratory and sharp/dull sensations in both feet but had no ulcers, breaks in the skin, or signs or symptoms of infection. (Tr. 1149). Thomas received a prescription for new shoes and orthotics. (Tr. 1150).

On July 1, 2019, Thomas was seen by an ophthalmologist, who found that she had proliferative diabetic retinopathy in her left eye and a mild-moderate case of the same in her right eye. (Tr. 1154). She was instructed on the risk of vision loss with uncontrolled diabetes. (*Id.*).

C. **Relevant Opinion Evidence**

1. **Thomas's Function Report**

On June 27, 2017, Thomas completed a function report on the limitations her conditions placed on her activities. (Tr. 388-395). She reported that she could not stand for long periods and would get dizzy spells "from time to time," both of which limited her ability to work. (Tr. 388). She stated that she had diabetic nerve pain that affected her ability to get dressed and bathe, as her feet would hurt so much that she would wait to get dressed and could not stand too long to bathe. (Tr. 389). She stated that "sometime[s]" she needed to be reminded to take her medication, she prepared food weekly, and she did "a little" around the house about three times a week for three hours. (Tr. 390). She needed encouragement to do housework because the pain was, at times, "unbearable." (*Id.*). She stated that she would leave the house about four times a month for the grocery store and appointments, but she would not go alone because of her dizzy spells. (Tr. 391). When she went shopping it was for about four or five hours. (*Id.*). She did not drive because of her vision problems. (*Id.*). Her interests included watching television and reading, which she did between four and six hours a day but was limited by her blurry vision. (Tr. 392). Her conditions affected her ability to stand, walk, climb stairs, see, complete tasks, and concentrate. (Tr. 393). She could walk approximately 50 yards before needing to rest for 15 minutes prior to resuming. (*Id.*). She could pay attention for "a pretty long time." (*Id.*). She had prescription shoes to help with her foot pain. (Tr. 394).

9

2. **State Agency Consultants**

On November 15, 2017, Leslie Green, MD, evaluated Thomas's physical capacities based on a review of the medical record. (Tr. 137-141). Dr. Green stated that Thomas had severe impairments of diabetic retinopathy, peripheral neuropathy, and diabetes. (Tr. 136). Based on the medical record, Dr. Green opined that Thomas had exertional, postural, visual acuity, and environmental limitations. (Tr. 138-141). Specifically, Dr. Green found that Thomas could: occasionally lift or carry 20 pounds; frequently lift or carry 10 pounds; stand or walk 6 hours in an 8-hour workday; perform limited pushing or pulling with her lower extremities; frequently climb ramps/stairs; never climb ladders, ropes, or scaffolds; was unlimited in her ability to balance, stoop, kneel, crouch, or crawl; and had limited visual acuity in her right eye. (Tr. 138-140).

On reconsideration, Anton Freihofner, MD, largely concurred with Dr. Green's assessment of Thomas's impairments, but additionally found that Thomas could: stand or walk only 2 hours in an 8-hour workday; sit for 6 hours in an 8-hour workday; occasionally climb ramps or stairs; and occasionally balance, stoop, kneel, crouch, or crawl. (Tr. 175, 178-180). He noted a minor additional limitation in the field of vision of Thomas's right eye. (Tr. 180).

D. **Relevant Testimonial Evidence**

Thomas testified at the ALJ hearing. (Tr. 58-90). She lived with her four children, ages 5 to 12. (Tr. 59). She performed household chores "a little bit" and received help from her daughter's father and oldest daughter. (Tr. 61-62). She would help with washing the dishes, cooking, and folding laundry. (Tr. 62-63). She also grocery shopped but did so with a friend's help because after "some time" her feet would begin to hurt. (Tr. 63). She had never driven and relied on friends or public transportation to get around. (Tr. 63-64). At her doctor's instructions,

she was not to exercise. (Tr. 65). She spent time on her cell phone and watching television. (Tr. 66). Thomas last worked in the fall of 2015 as a hairdresser. (Tr. 67-68, 71). She stopped before the end of the year because she was experiencing pain, her fingers were cramping, and her eyesight was blurry. (Tr. 69). The job required her to lift heavy boxes, stand, bend, squat, and use her hands. (Tr. 72-73).

Thomas's limited ability to walk or stand and her lack of energy prohibited her from working full time. (Tr. 75). Specifically, diabetic neuropathy and unknown breaks in both feet caused her problems with walking and standing. (*Id.*). She previously had surgery on her right foot due to an infection. (*Id.*). Before she discovered the break in her foot, she had an infected callus and was seeing a podiatrist for treatment. (Tr. 76). She had not been aware that either of her feet had been broken. (*Id.*). She did not normally require the use of any assistive devices, but the neuropathy left her in constant pain. (Tr. 76-77). She took medication for her diabetes and checked her blood sugar four times a day. (Tr. 78). She had been working on controlling her weight and eating properly to control her blood sugar. (Tr. 79-80). Since she was diagnosed with diabetes as a teenager, she had had issues with her eyes, including blurry vision. (Tr. 80-82). Her left eye was worse because of her high blood pressure, for which she was on medication. (Tr. 82).

About two times a month, the neuropathy in Thomas's foot would cause her to limp while walking. (Tr. 83-84). It also caused a sharp, burning pain in her feet but did not affect her hands. (Tr. 84-85). On good days, she could walk the length of her short driveway, but she could not walk over 20 minutes. (Tr. 85). Her vision also made it difficult for her to watch television. (Tr. 87). She did not have any friends or go out because of her condition. (Tr. 88). She could focus well on the computer. (Tr. 90).

### III. Law & Analysis

#### A. Standard of Review

The court reviews the Commissioner's final decision to determine whether it was supported by substantial evidence and whether proper legal standards were applied. 42 U.S.C. §§ 405(g), 1383(c)(3); *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007). "Substantial evidence" is not a high threshold for sufficiency. *Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019). "It means – and means only – 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Id.* (quoting *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)). Even if a preponderance of the evidence supports the claimant's position, the Commissioner's decision still cannot be overturned "'so long as substantial evidence also supports the conclusion reached by the ALJ.'" *O'Brien v. Comm'r of Soc. Sec.*, 819 F. App'x 409, 416 (6th Cir. Aug 7, 2020) (quoting *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003)). Under this standard, the court cannot decide the facts anew, evaluate credibility, or re-weigh the evidence. *Jones*, 336 F.3d at 476. And "it is not necessary that this court agree with the Commissioner's finding," so long as it meets this low standard for evidentiary support. *Rogers*, 486 F.3d at 241; *see also Biestek*, 880 F.3d at 783 ("It is not our role to try the case de novo." (quotation marks omitted)). This is so because the Commissioner enjoys a "zone of choice" within which to decide cases without being second-guessed by a court. *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986).

Even if substantial evidence supported the ALJ's decision, the court will not uphold that decision when the Commissioner failed to apply proper legal standards, unless the legal error was harmless. *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2006) ("[A] decision . . . will not be upheld [when] the SSA fails to follow its own regulations and [when] that error

12

prejudices a claimant on the merits or deprives the claimant of a substantial right."); *Rabbers v. Comm'r Soc. Sec. Admin.*, 582 F.3d 647, 654 (6th Cir. 2009) ("Generally, . . . we review decisions of administrative agencies for harmless error."). Furthermore, the court will not uphold a decision when the Commissioner's reasoning does "not build an accurate and logical bridge between the evidence and the result." *Fleischer v. Astrue*, 774 F. Supp. 2d 875, 877 (N.D. Ohio 2011) (quoting *Sarchet v. Charter*, 78 F.3d 305, 307 (7th Cir. 1996)); *accord Shrader v. Astrue*, No. 11-13000, 2012 U.S. Dist. LEXIS 157595 (E.D. Mich. Nov. 1, 2012) ("If relevant evidence is not mentioned, the court cannot determine if it was discounted or merely overlooked."); *McHugh v. Astrue*, No. 1:10-CV-734, 2011 U.S. Dist. LEXIS 141342 (S.D. Ohio Nov. 15, 2011); *Gilliams v. Astrue*, No. 2:10 CV 017, 2010 U.S. Dist. LEXIS 72346 (E.D. Tenn. July 19, 2010); *Hook v. Astrue*, No. 1:09-CV-19822010, 2010 U.S. Dist. LEXIS 75321 (N.D. Ohio July 9, 2010). Requiring an accurate and logical bridge ensures that a claimant, as well as a reviewing court, will understand the ALJ's reasoning.

      **B.     Step Four – Subjective Symptom Complaints**

Thomas argues that the ALJ failed to properly evaluate her subjective symptom complaints regarding pain and fatigue pursuant to SSR 16-3p. ECF Doc. 15 at 16-20. Specifically, Thomas asserts that the ALJ failed to adequately explain *why* she found her alleged symptoms inconsistent with the medical and other evidence in the record. ECF Doc. 15 at 18-19. Further, Thomas contends that evidence in the record actually supported her allegations of pain and fatigue. ECF Doc. 15 at 18-19. Thomas argues that, had the ALJ properly evaluated her pain and fatigue allegations, she would have a "vastly reduced RFC" requiring a finding that she was disabled. ECF Doc. 15 at 20.

13

The Commissioner disagrees.  ECF Doc. 16 at 15-21.  Specifically, the Commissioner argues that the existence of medical opinions in the record that were contrary to Thomas's allegations satisfied any obligation the ALJ had to explain the inconsistencies she found between Thomas's statements and the medical evidence.  ECF Doc. 16 at 18.

1.  **Step Four Standard**

At Step Four of the sequential evaluation process, the ALJ must determine a claimant's RFC by considering all relevant medical and other evidence.  20 C.F.R. §§ 404.1520(e), 416.920(e).  The RFC is an assessment of a claimant's ability to do work despite her impairments.  *Walton v. Astrue*, 773 F. Supp. 2d 742, 747 (N.D. Ohio 2011) (citing 20 C.F.R. § 404.1545(a)(1) and SSR 96-8p, 1996 SSR LEXIS 5 (July 2, 1996)).  "In assessing RFC, the [ALJ] must consider limitations and restrictions imposed by all of an individual's impairments, even those that are not 'severe.'"  SSR 96-8p, 1996 SSR LEXIS 5.  Relevant evidence includes a claimant's medical history, medical signs, laboratory findings, and statements about how the symptoms affect the claimant.  20 C.F.R. §§ 404.1529(a), 416.929(a); *see also* SSR 96-8p, 1996 SSR LEXIS 5.

A claimant's subjective symptom complaints are among the evidence that an ALJ must consider in assessing a claimant's RFC at Step Four.  *See* 20 C.F.R. §§ 404.1520(e), 416.920(e); *Blankenship v. Bowen*, 874 F.2d 1116, 1123 (6th Cir. 1989) ("Subjective complaints of pain or other symptoms may support a claim of disability.").  Generally, an ALJ must explain whether she finds the claimant's subjective complaints consistent with objective medical evidence and other evidence in the record.  SSR 16-3p, 2016 SSR LEXIS 4 *15 (March 16, 2016); *Felisky v. Bowen*, 35 F.3d 1027, 1036 (6th Cir. 1994) (The ALJ must clearly explain her reasons for discounting subjective complaints).  In conducting this analysis, the ALJ may consider several

factors, including claimant's efforts to alleviate her symptoms, whether any treatment was effective, and any other factors concerning the claimant's functional limitations and restrictions. SSR 16-3p, 2016 SSR LEXIS 4 *15-19; 20 C.F.R. §§ 404.1529(c)(3), 416.929(c)(3); *see also Temples v. Comm'r of Soc. Sec.*, 515 F. App'x 460, 462 (6th Cir. 2013) (stating that an ALJ properly considered a claimant's ability to perform day-to-day activities in determining whether his testimony regarding his pain was credible). The regulations don't require the ALJ to discuss each factor or each piece of evidence, but only to acknowledge the factors and discuss the evidence that supports her decision. *See Renstrom v. Astrue*, 680 F.3d 1057, 1067 (8th Cir. 2012) ("The ALJ is not required to discuss methodically each [factor], so long as he acknowledged and examined those [factors] before discounting a claimant's subjective complaints." (quotation omitted)). While the ALJ must discuss significant evidence supporting her decision and explain her conclusions with sufficient detail to permit meaningful review, there is no requirement that the ALJ incorporate all the information upon which he relied into a single tidy paragraph. *See Buckhannon ex rel. J.H. v. Astrue*, 368 F. App'x 674, 678–79 (7th Cir. 2010) (noting that the court "read[s] the ALJ's decision as a whole and with common sense").

    **2.    Analysis**

The ALJ failed to apply the proper legal standards in her evaluation of Thomas's subjective symptom complaints related to her diabetic neuropathy by failing to comply SSR 16-3p's articulation requirement; she did not explicitly explain why she found Thomas's subjective complaints inconsistent with the record and such reasons cannot be reasonably inferred from the decision as a whole. Regarding Thomas's subjective statements, the ALJ merely recited boilerplate:

> After careful consideration of the evidence, the undersigned finds that the claimant's medically determinable impairments could reasonably be expected to cause the alleged

15

> symptoms; however, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record for the reasons explained in this decision.

(Tr. 26). The first sentence of the ALJ's next paragraph reiterated that she found Thomas's statements inconsistent with the medical evidence. (*Id.*). However, as Thomas correctly points out, the ALJ never identified any specific inconsistencies between the evidence and Thomas's statements. ECF Doc. 15 at 18. Although the ALJ began the next paragraph by reiterating her finding, presumably to explain her decision, the remainder of the paragraph never answered the question of why she made such a finding. (Tr. 26). Instead, the paragraph summarized the medical evidence, including some statements that appear wholly unrelated to the issue of whether Thomas's claims regarding pain were inconsistent with the record, such as "[i]n April 2019, [Thomas] was not noted as a fall risk." (Tr. 26-27).

Further, the ALJ made only a passing reference to the "requirements of . . . SSR 16-3p" without any discussion – expressed or implied – of which factors were implicated by the evidence. SSR 16-3p, 2016 SSR LEXIS 4 *18-19; 20 C.F.R. § 416.929(c)(3); (Tr. 25-27). Reading the ALJ's decision as a whole does not shed any additional light on the ALJ's reasoning. The paragraphs before and after the boilerplate merely summarized Thomas's subjective complaints and the doctors' findings from various treatment notes, many of which did not speak to her symptoms' intensity, persistence, or limiting effects. (Tr. 26-27). Even examining the ALJ's analyses at other steps of the sequential evaluation does not create a reasonable inference of inconsistency between Thomas's stated concerns and the medical evidence. For example, the ALJ summarily stated at Step Three that, "[t]here is no indication in the record or testimony that [Thomas] meets this listing." *Buckhannon ex rel. J.H.*, 368 F. App'x at 678-79; (Tr. 24).

From this limited discussion, the ALJ appears to have made the same error the Sixth Circuit has warned about: "mistakenly believe[ing] [the boilerplate language was] sufficient to *explain* a credibility finding, as opposed to merely introducing or summarizing one." *Cox v. Comm'r of Soc. Sec.*, 615 F. App'x 254, 259-60 (6th Cir. 2015) (emphasis in original).[3] Such an error is not harmless because without an explanation connecting the ALJ's discussion of the evidence with her subjective symptom analysis, we cannot conduct a meaningful review of the ALJ's decision. *Id.* at 257 ("The error is not harmless where it obstructs meaningful review of the ALJ's decision") (citation omitted). And the ALJ failed to build a logical bridge between the medical evidence and its alleged inconsistency with Thomas's subjective statements. *Fleischer*, 774 F. Supp. 2d at 877. A remand is thus required. *Minor v. Comm'r of Soc. Sec.*, No. 5:18 CV 2233, 2019 U.S. Dist. LEXIS 208935, at *34-35 (N.D. Ohio Dec. 5, 2019).

The Commissioner attempted to flesh out the ALJ's minimal analysis by pointing out that there are two medical opinions in the record that conflicted with Thomas's statements about her limitations. From this, the Commissioner asserts that, "the claim that [t]he "ALJ never identifies any supposed inconsistencies between [the medical] evidence ant Plaintiff's testimony at the hearing or her other statements in the record" is plainly false. Pl's Br. At 18." ECF Doc. 16 at 18. The Commissioner argues that Dr. Green and Dr. Freihofner's opinions conflicted with Thomas's statements. The Commissioner makes the following argument to cap the point: "[T]he substantial evidence standard does not require a reasonable factfinder to construe all evidence

---

[3] The boilerplate language at issue in *Cox* was:
> After careful consideration of the evidence, the undersigned finds that the claimant's medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent they are inconsistent with the above residual functional capacity assessment.

615 F. App'x at 259-60.

17

short of total logical refutation as consistent with a claimant's subjective allegations for purposes of the disability claim, rather it asks what an ALJ as a reasonable factfinder can construe as inconsistent." ECF Doc. 16 at 18. Although it is not entirely clear what the point of that sentence is, the Commissioner cites two Sixth Circuit cases for the proposition, but neither supports it. I construe the Commissioner's argument to be that the ALJ is not required to negate every conceivable construction of the facts that may support a claimant's position in order to meet the substantial evidence standard when she relies on other evidence. The ALJ is permitted to construe the opinions of record as inconsistent with the claimant's assertions. I agree with this general proposition of law. But there's the rub, the ALJ *didn't* construe the opinions of Dr. Green and Dr. Freihofner to be inconsistent. The Commissioner does.

The Commissioner's argument constitutes post hoc rationalization. "[T]he courts may not accept appellate counsel's post hoc rationalizations for agency action. It is well-established that an agency's action must be upheld, if at all, on the basis articulated by the agency itself." *Berryhill v. Shalala*, 4 F.3d 993, at *6 [published in full-text format at 1993 U.S. App. LEXIS 23975] (6th Cir. Sept. 16, 1993) (unpublished opinion) (quoting *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 50, 103 S. Ct. 2856, 77 L. Ed. 2d 443 (1983) (citation omitted)).

The tension between reading the decision as a whole and the need for the ALJ to create a logical bridge between the evidence and the conclusion makes this case a close question. The Commissioner's desire to fill the gap created in the ALJ's discussion of Thomas's subjective symptom complaints, however, illustrates what differentiates this case from other decisions in which an ALJ may likewise rely on boilerplate formulations. *See cf. Avery v. Comm'r of Soc. Sec.*, No. 1:19-CV-1963, 2020 U.S. Dist. LEXIS 84878, at *37-42 (N.D. Ohio May 14, 2020)

(finding that the ALJ's evaluation of the claimant's subjective symptom complaints complied with the regulation, when looking at the decision as a whole).  Here, the ALJ's decision as a whole did not allow for a reasonable inference regarding which of Thomas's statements the ALJ found inconsistent and, thereby, unpersuasive.  Although an ALJ's reliance on boilerplate may be sufficient when the court can find support for the ALJ's conclusion in other statements the ALJ has made elsewhere in her decision, in this instance the text of the decision did not allow me to make that connection or conduct meaningful judicial review.  And, because the claimant is entitled to know – from the ALJ – why her claim is being denied, after-the-fact explanations by the Commissioner are simply not sufficient.

Accordingly, upon remand the ALJ should consider and evaluate the evidence related to Thomas's subjective pain and fatigue complaints and determine what effect, if any, that evidence has on the RFC.

**Recommendation**

Because the ALJ failed to apply proper legal standards in evaluating Thomas's subjective symptom complaints, I recommend that the Commissioner's final decision denying Thomas's applications for DIB and SSI be vacated and that Thomas's case be remanded for further consideration.

Dated: September 29, 2021

Thomas M. Parker
United States Magistrate Judge

---

**OBJECTIONS**

Any objections to this Report and Recommendation must be filed with the Clerk of Courts within fourteen (14) days after being served with a copy of this document. Failure to file objections within the specified time may waive the right to appeal the District Court's order. *See U.S. v. Walters*, 638 F.2d 947 (6th Cir. 1981); *see also Thomas v. Arn,* 474 U.S. 140 (1985), *reh'g denied*, 474 U.S. 1111 (1986).